The next case today is Claude Mary Luistilus Bonnet v. Merrick B. Garland appeal number 19-2175. Ms. Sieturski, please introduce yourself for the record and proceed with your argument. Thank you and may it please the court. My name is Julia Sieturski and I'm a Boston College Law School graduate appearing under the supervision of attorney Mary Holber. We represent petitioner Claude Bonnet. May I reserve two minutes for rebuttal? Yes, you may. Thank you, Your Honor. The IJ and the BIA made four legal errors when determining that Mr. Bonnet was not eligible for protection under the Convention Against Torture. First, they applied a heightened standard of proof. Second, they failed to distinguish Mr. Bonnet's case from a matter of JE and progeny. Third, they mischaracterized the evidence and fourth, they failed to follow and apply case law correctly. And turning towards the first point, the BIA erroneously applied a heightened standard of proof to Mr. Bonnet's case. The more likely than not standard under CAAT is a preponderance of the evidence, contrary to the much higher standard that the BIA erroneously imposed on Mr. Bonnet. And you can see this on page 11 of the administrative record. In this part of the decision, the BIA employed language such as all and each, resembling a standard closer to government contends that the BIA was simply addressing Mr. Bonnet's brief that the evidence proved that all Haitian prisoners are subject to what amounts to torture. However, Mr. Bonnet employed that language to explain how the evidence established that he was more likely than not to be tortured because these torturous acts were what were so widespread in Haitian prisons. But in this part of the BIA decision, the more likely than not standard is not mentioned once in relation to the likelihood that Mr. Bonnet would be tortured. And there's no indication that the BIA was evaluating Dr. Kivlin's evidence in relation to that proper standard. And turning towards the second error that the IJ and then BIA made, they did not distinguish his case from JE and progeny. In a matter of JE, the BIA found that abuse such as calamarasa could constitute torture. However, from the country conditions reports that the he hadn't proved that it was more than isolated instances of mistreatment in Haitian prisons. And here, Dr. Kivlin offered testimony that out of more than 100 conversations that she had with Haitian detainees throughout her time in Haiti, every single person was subjected to calamarasa while detained in Haiti. To be precise, correct me if I'm wrong, I don't think that was 100 people. It was 100 conversations. Yes, I believe that she was testifying though that more than these conversations were all with different people. And how many people were there? She just, she was asked whether it was more than 100 and she replied yes. She was asked whether there were more than 100 conversations. Yes, your honor. So do we know how many people she spoke with? Our position is that each of these conversations were with different people. So there were more than 100 people that she had conversations with even though she did not use the term people. And these 100 conversations is evidence that proves that these torturous acts as recognized by the BIA are so pervasive that it is more likely than not to happen to Mr. Rone. Let me ask you a line of reasoning which you won't accept all these premises but for purposes of answering it if you could that would be helpful to me. Okay, yes your honor. Suppose I agreed with the agency that the answers about more likely and less likely were not answers about what was more likely than not to happen but were merely you know tendencies without any probability ultimate probability being assigned. It still seems to me that the record provides some support and maybe even enough support on this point for it to be helpful to you that this petitioner will be detained for some period of time through processing and that everyone processed has the same head shaving at least I guess if the hair is long enough to warrant it with the dull blade. As I understand it you make an argument to us and you made an argument below to the what supports that particular contention in your briefing to us you refer to the fact that it could result in lacerations and there's testimony from the expert could you just describe it because one way to understand the reference to the J&E decision in the BIA's decision when it refers to illicit motive is that the it could have a purpose that is not itself a wrongful purpose and so depending on how it's conducted it might not rise level of torture but obviously there are certain ways you could do it in which it certainly seems to be it could. What on this record would suggest that you'd be compelled to find that the head shaving that will occur to those processed will in every instance or in most instances be conducted in a manner that would rise the level of torture? Yes your honor so Dr. Coven testified as to the stigmatization of Haitian deportees coming from the U.S. and Mr. Bonet who does wear his hair long is culturally American when he is deported to Haiti will be sorry these these acts are meant to inflict torture in order to kind of scare these deportees coming back from the U.S. basically into not wanting to commit crimes in Haiti not basically just show that the prisons in Haiti are no joke and she testified that there were there's a general sentiment in in Haiti that these Haitian prisons were no joke and that these conditions and these practices were done intentionally to basically spread that sentiment but I would like to point out that Cal Marasa which Dr. Kilburn did establish was did happen to every single Haitian prisoner that she talked to was recognized by both the BIA and several other Circuit Court of Appeals as constituting torture so just the fact that Cal Marasa is more likely than not she doesn't testify that that happens to every person who's processed even during a short-term processing not not every single person that was processed because she is one person does not have the ability to talk to every single person that was processed but she had a hundred covers more than a hundred conversations I'm just saying money about the likelihood of it happening seems somewhat contingent on how long you're in prison but her testimony about the head-shaving seems not to be contingent on that because she seems to be saying that happens to everybody who's processed and will be processed that's time counsel you may finish your answer thank you um the out of all the conversations that she had with Haitian prisoners regardless of the length of detention they were subjected to Cal Marasa and also happened to every single person on processing so mr. Burnett is more likely than not to be tortured upon his upon his deportation to Haiti thank you mr. Tursky attorney remnants please unmute your audio and video and proceed with your argument hey please record your honors Tim remnants on behalf of the United States Attorney General I'm unclear if my video is working at this point but it seems to be working on my end but you can I'm sure that it's time like the court can hear me though in this immigration case petitioner through his expert dr. Kivlin claim that a series of events would occur this is a culminated yes this let me interrupt you for a second and ask my colleagues can you hear mr. Raddatz can hear him yes okay go ahead thank you thank you this immigration case petitioner claim based on a testimony of his expert dr. Kivlin that a series of events would occur once he was removed to Haiti that would culminate in his torture by with authorities however the agency recently found that dr. Kivlin testimony to not establish clear probability that one of these events would occur much less each of these events occurring successions culminate in petitioners torture there's two different series of events petitioners expert described first thing that he would be detained longer than initial processing once he's moved to Haiti now in detention prison guards would target him for torture the second was a series of events based on vigilante members of the community targeting identifying him as a deportee and targeting for torture and the police acquiescing in that torture in the first series of events dr. Kivlin when you start with the her testimony about being detained she said that first their law in Haiti requires after initial processing someone to be released she went on to describe that authorities sometimes don't apply this process uniformly and that they retain some discretion to continue to detain people and that was where first hitch in petitioners claim occurred because it's very difficult to quantify unfettered discretion of that nature I know dr. Kivlin attempted to quantify it saying that she believed that certain characteristics petitioner possessed might result in exercise of this discretion but when it comes to discretion is inherently difficult to exercise it's also important to know what she basically concluded on it was based on 30 interviews with criminal deportees so one these aren't people that were detained because of political ties or family ties and that was two of the three characteristics dr. Kivlin said might result in detention so we know many interviews supporting those two characteristics the result of detention and the first one about criminal deportees was based on such a small sample size these be reasonably found doesn't compel the conclusion that the petitioner be similarly detained and moreover out of those 30 interviews most stated that it'd be painful one or two days a few days which as the government pointed out that's not prolonged detention and shorter the amount of time of detention the less likely that there would be interaction with prison guards a petitioner claim would torture him so the first event has changed recently found dr. Kivlin testimony didn't show a likelihood he would be detained it's the next step in the chain which is the likelihood that petitioner would be targeted for torture by prison guards this was based on dr. Kivlin testimony that she said that over 100 interviews she'd had people stated they experienced these forms of torture head-shaving as the panel noted and first of all dr. Kivlin self-described her findings as a collection of stories a narrative account and she distinguished her testimony from what she described as a quantitative report such as a human rights about the this particular point I don't read the BIA to opinion to reject her testimony that all people processed would endure the head-shaving she described I don't see any part of the BIA opinion rejecting that part of her testimony do you I believe that's where we get petitioners argument about a heightened standard of review being applied because BIA did reject this claim they made an appellate brief dr. Kivlin testimony meant everyone that goes through processing or no no that respect with respect I agree with you with respect to the ear boxing and other things but she testified that it was the norm that everyone who went through processing would be have their head shaved with the dull blade through the processing and I don't see there being any dispute that he'll be processed and I don't see there being any dispute by the BIA that every person who is processed will endure the head-shaving do you I just don't see that I don't just like if you get to the other types of torture that she or quote torture that she describes that may depend on length of detention and then the BIA is taking a view on that but with respect to this one particular argument which was made to the BIA that all persons are processed that this person would be processed that the norm in processing is to shave the head with the dull blade and that results in lacerations and that he would be subject to that treatment I don't see the BIA engaging with that at any point do you I do not but I think there has that's five minutes counsel I believe dr. Kivlin stated that the bundle of horrors was going to occur once someone was placed into detention after initial processing so initial processing was immigration processing that occurred when someone is removed United States from every every torture or abuse she describes was something that occurred when an officer exercises discretion to further detain someone so I don't believe she was describing as part of this initial immigration processing it was part of this bundle of horrors in detention so that's when you get to the first link in the chain would this person be subject to prolonged detention just to just just to push back on that a little bit on the processing the I understood the argument there was that the processing could take longer than just a few hours or just you know right when you come in and that they could extend the processing by weeks or up to a month and that during that processing that could be extended during that period they were in detention it may be a jail rather than a prison but there didn't seem to be any distinction that they were being detained and as part of being detained I think judge Barron's point is that part of being detained is they were having their head shaved I think we're just using processing differently and dr. Kidman was using it differently there's the initial processing of immigration processing before they released someone and then they had these characteristics and a nebulous characteristics that would just result in this detention afterwards so that really what a part of this immigration processing it was part of some detention for characteristics that petitioner uniquely possessed that was dr. Kovac said his political ties his lack of family and his criminal record so these weren't part of immigration processing that would occur where the law says you must release them afterwards this is part of some vague form of continued detention and that was when the abuses occur within this continued detention when someone exercised their discretion just to hold someone while they look for family ties while they research their political ties while they assessed how dangerous this person was this is something beyond the typical initial immigration processing that she was describing I said you're that you go through they do just you land at the airport who are you and then there's a separate decision to detain some number of them and it's when you're detained it might be early on detention you the head shaving occurs and then the more you stay there more other things may occur but until you have that threshold decision to detain your suggestion is that none of the practices dr. Kivlin's describing occur in the processing alone correct I believe her testimony was describing once you get into prolonged attention based on these characteristics that she said petitioners is that that would start this prolonged attention that is when these prison guards would target you for these forms of abuse that were previously referenced in the VR for decision matter J that that that may factually be what happens I don't know but her testimony was to refer to prolonged attention as being that one to prolonged but it seems like that's what she was talking about was the you don't go past you know you get to the counter at the airport and they say oh nope you're not walking through the counter we're past the counter where we're got to do a little bit more inquiry and she referred to that as the prolonged attention and it seems to me she didn't really distinguish between treatment there and treatment in prisons I agree that was her testimony and as you noted your honor this initial processing happens at the airport and then this was prolonged attention that she was focusing on because that's where she said this these abuses would occur by prison guards by jailers it's not by the people processing in initial processing this which happens to every returning Haitian citizen that's why they she tried to use her testimony to place him in this prolonged attention and her testimony ultimately showed those even in prolonged detention it was usually one or two days and one or two days that's just look it's not the reason they found that's not going to show just a second I think judge Tawani has a question yeah I have I have one question about the matter of OFAS and Costa Beholder I I think you write so in matter of OFAS the Attorney General essentially said we should be using for official conduct we should be using a color of law standard rather than a rogue officer standard that are you are you with me there yes and and you argued in your brief that the petitioners arguments should be rejected there because Costa is binding authority because it's a First Circuit decision but you're there representing Attorney General the Attorney General has taken this position as to how we should be dealing with rogue officers versus 1983 sorry the color of law standard are you suggesting that we should not be following I mean maybe it's that it doesn't matter in this case but but you're suggest it seemed like you were suggesting that the color of law standard shouldn't be what the First Circuit uses despite what the Attorney General has said I was making two suggestions first is yes it does not matter in this case because the immigration judge made initial factual findings didn't show a clear probability this acquiescence by police would happen in this case to these vigilante mobs because it was based on dr. Kipling's testimony about one isolated incident that occurred in 2013 where she witnessed police not doing anything about the mob so that was the first part of the IJ's finding so we say it doesn't matter because immigration judge reasonably found this one isolated event didn't show a clear probability that police have acquiesced in the future then you go to the IJ's second sentence after that where he cites Kosta we also argue that suggests that Kosta is not inconsistent with a matter of OFAS or OFAS part two is OFAS and Kosta both described that one you look at first whether a police abuse has occurred whether there has been an action undercut of a color of law and then you look to see whether or not other authorities would respond to that police abuse just as would occur in the United States there be a corrupt police officer but that police officer might be investigated and prosecuted by other authorities so there's no acquiescence that's what Kosta says that's a matter of OFAS one says fighting Kosta with approval and OFSA 2 doesn't change that standard but what it discusses is taking out confusing language about rogue police officers because people have been using the term inconsistently they say and what OFSA 2 explains is that rogue police officers sometimes has been used by adjudicators to mean someone acting outside of their initial capacity and they said that's correct way to use it but some adjudicators have also used it to describe low-level officials abusing their authority and that doesn't matter if they're abusing their authority there's been a police abuse that's all that matters and then you look to the next step whether or not the authorities would respond to that police abuse so that's what OFSA is stating I think that's consistent with Kosta because Kosta first and looks to whether or not the officers in that case were abusing their authority and then they cited anti-corruption reports saying well it's also unclear whether or not the authorities would respond to such police abuse so that's a few suggestions the government makes in this case is one doesn't matter because the immigration judge made a no likelihood finding this would occur because it was based on an isolated event and two even it gets to the second part there's no showing that the authorities would not respond to such police abuse thank you thank you are there any more questions for mr. remnants no thank you mr. remnants thank you mr. ski please unmute your audio and video and proceed with your rebuttal time thank you just two points on rebuttal first nothing in dr. Kevin's testimony suggests that Haitian prison officials reserve ear boxing shaving a prisoner's head with a dull razor only for those whose detention is question about the head shaving dr. Kivlin did testify that prisoners coming in with longer hair for example mr. bonet their hair would be considered too long so that they would have their head purposely shaped with the dull razor which was result in lacerations to the scalp and on page 212 of the administrative record she referred to the head shaving along with calmer ASA as particular techniques that are meant to inflict extreme pain as well as when do you say the head shaving occurred at what point in the processing walkers through someone gets off a plane yes if they're a patient returning they're initially processed in some manner and some of them go to prison and some don't yes your honor is the does the head shaving occur at that point before the decision is made as to whether they go I am NOT 100% sure on the timing of the head shaving but regardless of the timing whether it occurs at initial processing or upon detention due to the three factors specific to mr. bonet he is more likely than not to be detained past that initial one-day processing and she also spoke to a police officer as she testified on page 216 of the administrative record and he told her that the intention was to make Haitian prison seemed so bad that the misery of poverty should be like paradise because of misery of prison is so bad and second in matter of OFAS the Attorney General held that no BIA precedent should be construed to endorse this rogue that's time counsel thank you finish your should be construed to endorse this distinct rogue official standard and so the standard which no longer exists was used by both the IJ and the BIA by the BIA on page 11 of the administrative record and by the IJ on page 88 thank you thank you that concludes argument in this case missy a sir ski attorney Hopper and attorney remnants you should disconnect from the hearing at this time